## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

Pryor Ramone Crowe,

                Plaintiff,        Case No. 23-12698

v.                          Judith E. Levy
                                United States District Judge

U.S. Department of
Transportation, *et al.*,        Mag. Judge Kimberly G. Altman

                Defendants.

_____/

## OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [28]

On October 24, 2023, Plaintiff Pryor Ramone Crowe initiated this action against Defendants Pete Buttigieg,[1] the U.S. Department of Transportation, and the Federal Aviation Administration (the "FAA"). (ECF No. 1.) He filed an amended complaint on October 23, 2024. (ECF No. 26.) Plaintiff enumerates two counts: violation of Title VII based on race ("Count I") and Title VII retaliation based on Plaintiff's protected

---

[1] Plaintiff appears to sue Buttigieg in his official capacity. The Court substitutes Sean Duffy, the current Secretary of Transportation, as Defendant. *See* Fed. R. Civ. P. 25(d).

activity ("Count II"). On November 8, 2024, Defendants filed a motion for summary judgment as to both counts, and potentially, a hostile workplace claim.[2] (ECF No. 28.) On May 6, 2025, the Court held a hearing on the motion and granted it as to Count I and any hostile work environment claim for the reasons set forth on the record. The Court took Count II under advisement. For the reasons set forth below, the Court grants the remainder of Defendants' motion, which is on Title VII retaliation only.

## I.      Relevant Background

### a.      Plaintiff's Career at the FAA

Plaintiff is an African American man who served in the United States Navy and then was hired by the FAA. (ECF No. 30, PageID.635.) He received numerous awards for his civil service, including the Individual Diversity of The Year Award from the Detroit Federal Executive Board. (*Id.* at PageID.649.) Plaintiff began serving in the National Policy Group at the FAA in 2016, and he remained in this role as of the filing of the amended complaint in October 2024. (*Id.* at

---

[2] Although the hostile workplace claim is not listed as a count in the amended complaint, the parties addressed it in their filings as a separate claim and as a theory for Title VII retaliation.

PageID.628.) For over 30 years, he availed himself of the Equal Employment Opportunity process by initiating complaints about unfair and unequal employment practices. He filed multiple complaints against a now-retired executive at the FAA named Jo Tarrh for systemic race discrimination. (ECF No. 28-2, PageID.357.) These complaints did not result in any findings of discrimination. (*Id.*)

Plaintiff alleges that in response to his complaints, Tarrh colluded with her subordinates to retaliate against him. (ECF No. 30, PageID.613.) For instance, Plaintiff alleges that a member of the Executive Board named Allan Borling was involved in an ethics investigation against him for alleged misconduct related to his outreach work. (*Id.* at PageID.609.) The investigation did not result in any discipline.

In 2021, while the ethics investigation about Plaintiff's outreach work was still pending, Borling approved Plaintiff to take a temporary detail position under a supervisor named Chris Sharp to lead the development of a plan to scale up an existing program called Adopt-A-School ("AAS"). (*Id.* at PageID.891, PageID.919.) AAS presented lesson plans about aviation careers to young students. Plaintiff's role was to

3

draft a scaling plan for Sharp's review that would be presented to the steering committee and executive board. (*Id.* at PageID.721–722.) Sharp discussed with Plaintiff that the program was to focus on students in the fourth grade. (*Id.* at PageID.695, PageID.920.) Plaintiff timely submitted his draft, which included efforts for seventh- to eleventh-grade students and heavily criticized the existing program. (ECF No. 28-2, PageID.366.) In response, Sharp stated that the draft should have been restricted to fourth-grade students and terminated Plaintiff's detail. (ECF No. 28, PageID.328; ECF No. 30, PageID.749.) Sharp did not issue Plaintiff a negative performance evaluation or additional discipline.

## b.   Basis for Retaliation Claim[3]

In 2022, Plaintiff complained again that he was discriminated against, this time due to the filing of the ethics complaint and the termination of his detail with Sharp. (ECF No. 26, PageID.268.) In April 2022, he told his immediate supervisor, Eva Pueschel, about "a hostile work environment and systemic discrimination and racism."[4] (*Id.* at

---

[3] As Plaintiff acknowledged at the May 6, 2025 hearing, the 2022 complaint is the protected activity that serves as the basis for his retaliation claim.

[4] According to the amended complaint, Pueschel then requested "an accountability board management inquiry in accordance with FAA policies and

PageID.268.) He also filed an Equal Employment Opportunity ("EEO")
complaint. (ECF No. 28-3, PageID.390.) In September of 2023, Plaintiff
filed a complaint with the FAA Office of Inspector General. (ECF No. 26,
at PageID.269.) In October 2023, he filed a complaint with the Office of
Special Counsel for failing to investigate his complaint within 55 days
and violating agency policy. (*Id*. at PageID.268.) During this time,
Plaintiff also e-mailed management at the FAA about the alleged
discrimination. (*See* ECF No. 28-3, PageID.391.) Count II concerns
alleged retaliation for these complaints.

### c.   Events in Response to Plaintiff's Complaints

Three negative events occurred after Plaintiff's complaints in 2022:
(1) Pueschel told Plaintiff via a phone call and e-mail to stop e-mailing
FAA management about the alleged discrimination until Plaintiff had
the facts; (2) Plaintiff received negative comments on his work

---

procedures." (*Id*. at PageID.268.) "When the Board declined to investigate because
his allegations overlapped his EEO, Pueschel chose to do a management inquiry so
[Plaintiff] could be heard." (ECF No. 28, PageID.330.)

5

performance; and (3) there were further investigations into Plaintiff.[5] (ECF No. 30, PageID.583–584.)

First, Pueschel told Plaintiff to stop e-mailing FAA management about alleged discrimination. (ECF No. 28-2, PageID.376.) Pueschel "stated that [Plaintiff] probably shouldn't send an e-mail regarding this until [he knows] what it's about since [he doesn't] have any details." (ECF No. 28-3, PageID.391.) In her deposition, Pueschel contextualized,

> Right away [after Plaintiff heard about an ethics investigation against him, he] started talking about sending e-mails to, you know, everyone in the management chain. And I said, "You shouldn't send an e-mail before you even know what this is about." . . . Don't send an e-mail all the way up the chain when you don't even know what this is about.

(*Id.*)

Second, Plaintiff received several negative comments on his performance. Pueschel discussed concerns with Plaintiff's job performance in a "midterm" evaluation that was meant "to take a poll somewhere of people's performance . . . and help them get back on track."

---

[5] In his response to the motion for summary judgment, Plaintiff briefly states a potential fourth negative event: Pueschel allegedly "derided" him "for her belief that Plaintiff called her a racist." (ECF No. 30, PageID.585.) But Plaintiff does not provide evidence of any response by Pueschel to the accusation of being a racist, much less a derision, so the Court does not consider it.

6

(ECF No. 28-3, PageID.392.) A summary of the discussion was logged in a "performance management system." (*Id.*) Moreover, in mid-2024, Pueschel emailed Plaintiff that his work needed improvement. Although neither party provides copies of the emails, Defendants do not dispute their existence. In the amended complaint, Plaintiff describes a May 22, 2024 e-mail that "call[ed] into question the work performance of Plaintiff, his work ethic and commitment" and a July 24, 2024 e-mail "where [Pueschel] characterized his performance as insufficient and needing improvement." (ECF No. 26, PageID.282–283.)

Third, five investigations were initiated against Plaintiff after the 2022 complaints.[6] On February 6, 2024, a formal ethics complaint was filed against Plaintiff. (*Id.* at PageID.279.) Ultimately, "[u]pon review of the investigation report, it [was] determined that no action [was] required." (*Id.* at PageID.281.) On July 16, 2024, Plaintiff was advised of two "hotline" complaints about him. (*Id.* at PageID.283.) On July 18, 2024, he learned of an additional two hotline complaints. (*Id.*) In each ethics investigation or complaint, no action was taken against Plaintiff.

---

[6] Plaintiff does not provide the content of any of these investigations. In their motion for summary judgment, Defendants provide summaries of three hotline complaints.

7

## II. Legal Standard

"Summary judgment is proper where no genuine dispute of material fact exists and the moving party is entitled to judgment as a matter of law." *Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 526 (6th Cir. 2012) (citing Fed. R. Civ. P. 56).

"The non-moving party must 'do more than simply show that there is some metaphysical doubt as to the material facts.'" *Baker v. City of Trenton*, 936 F.3d 523, 529 (6th Cir. 2019) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). "However, in considering the evidence in the record, the court must view the evidence 'in a light most favorable to the party opposing the motion, giving that party the benefit of all reasonable inferences.'" *Id.* at 529.

## III. Analysis

Plaintiff's sole remaining claim is Count II, which alleges retaliation in violation of Title VII. To make out a Title VII retaliation claim at the summary judgment stage, "a plaintiff must adduce either direct or circumstantial evidence." *Jenkins v. Regents of the Univ. of Mich. Health Sys.*, 763 F. App'x 545, 550 (6th Cir. 2019) (quoting *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 584 (6th Cir. 2009)). "Direct evidence is

evidence that, 'if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions.'" *Id.* (quoting *Grizzell v. City of Columbus Div. of Police*, 461 F.3d 711, 719 (6th Cir. 2006).) If the plaintiff offers no direct evidence, but only circumstantial evidence, the plaintiff's claims are considered under the three-step McDonnell Douglas burden-shifting framework. *Id.*

Since Plaintiff concedes he does not have direct evidence of retaliation based on race, the three-step McDonnell Douglas burden-shifting framework applies. Under this framework, the plaintiff must first establish a *prima facie* case of discrimination. *Speed Way Transp., LLC v. City of Gahanna*, No. 24-3607, 2025 U.S. App. LEXIS 6467, at *7 (6th Cir. Mar. 18, 2025) (citing *Levine v. DeJoy*, 64 F.4th 789, 797 (6th Cir. 2023)). The plaintiff must demonstrate that "(1) he engaged in protected activity; (2) defendants knew he exercised his protected right; (3) defendants subsequently took an adverse employment action against him; and (4) his protected activity was the but-for cause of the adverse employment action." *Echols v. Ky. Just.*, No. 24-5715, 2025 U.S. App. LEXIS 6977, at *6 (6th Cir. Mar. 24, 2025) (quoting *Boshaw v. Midland Brewing Co.*, 32 F.4th 598, 605 (6th Cir. 2022)).

9

"If the plaintiff makes a prima facie showing, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse action." *Zandvakili v. Univ. of Cincinnati*, No. 23-3396, 2024 U.S. App. LEXIS 1832, at *12 (6th Cir. Jan. 25, 2024) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804 (1973)). If the defendant produces evidence establishing this reason, the burden shifts back to the plaintiff "to prove by a preponderance of the evidence that the reasons offered are a pretext for discrimination or retaliation." *Id*. The plaintiff may, but does not necessarily, show this "by demonstrating that the employer's reason had no basis in fact, did not actually motivate the employer's action, or was an insufficient motivation." *Id. "*The 'ultimate inquiry' is whether the employer's stated reason is the true reason." *Id.* (citing *Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 888 (6th Cir. 2020)).

Here, Plaintiff fails to establish a *prima facie* case of retaliation because he does not demonstrate that Defendants took an adverse employment action against him.[7] For the third prong,

---

[7] Plaintiff satisfies the first prong of a *prima facie* case. Complaining about unlawful employment practices like discrimination is a protected activity. *Browning v. Franklin Precision Indus., Inc*., No. 23-5406, 2023 U.S. App. LEXIS 32410, at *9

> Plaintiff's burden of establishing a materially adverse employment action is less onerous in the retaliation context than in the anti-discrimination context. . . . To establish the third element of the prima facie Title VII retaliation claim, a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.

*Laster v. City of Kalamazoo*, 746 F.3d 714, 727 (6th Cir. 2014) (internal quotations and citations omitted).

In a retaliation claim, unlike an initial discrimination claim, the Court does not evaluate each incident separately but instead looks to their cumulative effect. *Sanford v. Main St. Baptist Church Manor, Inc.*, 327 F. App'x 587, 599 (6th Cir. 2009) ("[W]hile some of the incidents alone may not rise to the level of an adverse employment action, the incidents taken together might dissuade a reasonable worker from making or supporting a discrimination charge.").

---

(6th Cir. Dec. 5, 2023) (finding the plaintiff satisfied the first element of a *prima facie* case because he "engaged in a protected activity when he complained about discriminatory conduct . . . and when he filed his EEOC charge"). Plaintiff's protected activity was complaining about the 2022 work detail termination and ethics complaint. (ECF No. 30, PageID.587.) Plaintiff likely cannot satisfy the second prong—that Defendants knew he exercised his protected right—but the Court need not address it in this opinion because Plaintiff does not establish an adverse employment action.

11

As set forth above, there are three potential negative events that could be considered adverse action: (1) Pueschel told Plaintiff via a phone call and e-mail to stop e-mailing FAA management about the alleged discrimination until Plaintiff had the facts; (2) Plaintiff received negative comments on his work performance; and (3) there were further investigations into Plaintiff. (ECF No. 30, PageID.583–584.)

Even combined, these events fail to meet the low threshold for an adverse action. First, Plaintiff does not cite—and cannot cite—to any authority that says that asking an employee to stop complaining to management about alleged discrimination before knowing all the facts is an adverse action. In fact, the Sixth Circuit has specifically found that a supervisor sending letters requesting that an employee not discuss discrimination complaints during work hours does not constitute a materially adverse action, even if it caused the plaintiff stress:

> In this case, [Plaintiff] Jones argues that the letters that he received from Ford on January 12, 1999, April 19, 2001, and April 29, 2002, each of which requested that Jones refrain from contacting employees regarding his pending EEO complaint, constituted adverse actions for purposes of his retaliation claim. . . . The first two letters arguably do not contain any reprimands, and certainly not any threats. They merely "request[] that you refrain from contacting any NRCS employee for information on official time." . . . The third letter directs Jones "to immediately stop

12

attempting to discuss your appeal and related witness statements with anyone during business hours or in government offices," and that failure to stop "may result in official disciplinary action." . . . We conclude that these letters do not constitute a materially adverse action under the *Burlington Northern* [Supreme Court] standard. These are not the types of actions that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination."

*Jones v. Johanns*, 264 F. App'x 463, 469 (6th Cir. 2007). In this case, the evidence that Pueschel's comment is an adverse action is even less persuasive—Plaintiff points to only a phone call and single e-mail from a supervisor in February 2024 that told him to refrain from contacting FAA management until he had the facts, and FAA management only. Moreover, unlike in *Jones*, that e-mail did not tell Plaintiff to stop complaining entirely or threaten disciplinary action; it only told him not to "send an e-mail regarding this [to management] *until [he knows] what it's about since [he doesn't] have any details*." (ECF No. 28-3, PageID.391 (emphasis added).) The Sixth Circuit found that the plaintiff in *Jones* could not meet the standard for a materially adverse action with significantly more consequential communication: three formal and severe warning letters to stop complaining on company time. Here, Plaintiff has only a single phone call and e-mail that logically told him to wait until he

13

had more facts *before* e-mailing management of a U.S. federal government agency like the FAA were adverse actions that would dissuade a reasonable employee from complaining about discrimination.

The Court looks to the cumulative effect of the incidents to determine whether together they constitute an adverse action. *Sanford*, 327 F. App'x at 599. But even when considered along with the negative comments about Plaintiff's work performance and the ethics investigations, Plaintiff cannot satisfy the third prong of the McDonnell-Douglas test.

In some cases, a negative performance evaluation may constitute an adverse action. For instance, when there is evidence that a negative employment evaluation "renders an employee ineligible for a promotion and therefore affects her advancement potential," it might contribute to "dissuad[ing] a reasonable worker from making or supporting a charge of discrimination" and thus be adverse. *Henry v. Abbott Lab'ys*, 651 F. App'x 494, 504–05 (6th Cir. 2016). Similarly, if the negative evaluation or performance improvement plan results in termination from a job, that is

14

materially adverse.[8] *Kyle-Eiland v. Neff*, 408 F. App'x 933, 941–42 (6th Cir. 2011) (noting "a negative performance evaluation may rise to the level of an adverse action if the employee can point to a tangible employment action that []he alleges []he suffered or is in jeopardy of suffering because of the downgraded evaluation").

But this case is more like another recent Sixth Circuit case, *Sutton*, which affirmed a district court decision that distinguished its facts from *Henry* and *Kyle-Eiland*. *See Sutton v. Ohio Dep't of Rehab.*, No. 23-3615, 2024 U.S. App. LEXIS 7871, at *4 (6th Cir. Apr. 2, 2024). In *Sutton*, the plaintiff argued that a negative annual performance evaluation— combined with, among other incidents, four reports filed against her— amounted to a materially adverse action. Finding that these actions did not satisfy the third prong, the Sixth Circuit stated, "a negative performance evaluation does not meet even the lower adverse-action standard applicable to retaliation claims 'unless it significantly impacts an employee's wages or professional advancement.'" *Sutton,* 2024 U.S.

_____

[8] Although the Sixth Circuit has not determined whether a negative *midyear* evaluation alone could constitute an adverse action, other courts have found that it likely does not. *See, e.g., Coulibaly v. Pompeo*, No. 14-712, 2020 U.S. Dist. LEXIS 58622, at *19 (D.D.C. Mar. 31, 2020) ("[A] claim based on the mid-year evaluation report alone, without more details, would not be actionable.").

App. LEXIS 7871, at *4 (quoting *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 290 (6th Cir. 2012) (cleaned up)). The four incident reports filed against the plaintiff after she filed an EEOC complaint did not change the analysis because three of the reports resulted in investigations "but were not pursued further," and the last one resulted in a written reprimand but no disciplinary action. *Id.* at *3.

Like the plaintiff in *Sutton*, Plaintiff does not allege that because of the negative evaluation or e-mails about his performance, he was demoted, not promoted, or in any way had his wages or professional advancement impacted.[9] Plaintiff cannot "point to a tangible employment

---

[9] Plaintiff's amended complaint states that the actions "seriously affected the psychological well-being of Plaintiff, who is diagnosed with PTSD" and that this "has had an impact on Plaintiff's desire to remain in his job and has acted as a bar from Plaintiff advancing his career." (ECF No. 26, PageID.282–283.) Yet the standard for an adverse action is an "objective standard" and requires that the incidents "dissuade[] a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006). While the Court is sympathetic to Plaintiff's mental health, "a plaintiff's subjective impression concerning the desirability of one position over another generally does not control with respect to the existence of an adverse employment action." *See Mitchell v. Vanderbilt Univ.*, 389 F.3d 177, 183 (6th Cir. 2004). The fact that the negative comments affected Plaintiff's diagnosis and made him rethink future career decisions does not mean that a reasonable worker would be dissuaded from making or supporting a charge of discrimination upon hearing that his work needs improvement in a review.

action that []he alleges []he suffered or is in jeopardy of suffering." *Kyle-Eiland*, 408 F. App'x at 941–42. Plaintiff does not dispute that "[d]espite his extensive protected activity, [he] has been promoted, continued to receive detail assignments to build his skills, and been selected to conduct outreach on behalf of the FAA." (ECF No. 28, PageID.341.) In fact, at the hearing, Plaintiff's attorney conceded in regard to the case overall, "It's difficult for us to argue that there was a shift in pay [or other changes in the terms and conditions of Plaintiff's employment] because that didn't happen."[10] The midterm evaluation and e-mail feedback only served to communicate to Plaintiff what he needed to address during the rest of the year. Because there is only a subjective belief that Plaintiff experienced retaliation and no evidence of an impact on wages or other tangible employment decision, there is no adverse action as required by the third prong of this analysis. *See Kyle-Eiland*, 408 F. App'x at 941–42.

---

[10] In his amended complaint, Plaintiff references a January 31, 2024 e-mail that an Attorney at the Office of Special Counsel allegedly wrote to him, which stated, "[f]or many years now, [White supervisors] have made a concerted effort to block your promotion efforts and hinder any sort of career advancement." (ECF No. 26, PageID.269.) However, Plaintiff does not provide a copy of the e-mail; admits that there is no evidence the sender conducted an investigation before making this conclusion; does not provide an example of any blocked promotion; and does not limit the e-mail to potential adverse actions *after* the complaint about the 2022 termination of his detail, as opposed to events before it.

As for the third negative event, which is that Plaintiff was investigated regarding some complaints, Plaintiff does not provide the investigation documents in his complaint or response to this part of th motion for summary judgment. In any event, the investigations would not lead to a finding of an adverse action.

Although the Sixth Circuit found that four investigations that did not lead to disciplinary action did not constitute an adverse action in *Sutton*, the Sixth Circuit has found in other cases that a "frivolous and malicious investigation" that resulted in no findings may contribute to a finding of an adverse action under the third prong. *See Laster*, 746 F.3d at 732 (highlighting "internal investigation into possible wrongdoing" that "resulted in no conclusive findings" when determining that a *prima facie* case for retaliation has been pled). Ultimately, the instant case is closer to *Sutton*, rather than *Laster*.

In *Laster*, the plaintiff presented evidence that an investigation into whether he was acting unlawfully or was intoxicated was "frivolous and malicious." *Laster*, 746 F.3d at 723. The Court noted,

> Plaintiff has submitted various affidavits, including his own, suggesting that Defendants' version of the events is "absolutely incredible," and that Defendants obtained false, accusatory reports because it is the "culture" . . . for officers to provide memoranda in

the style of a police report when asked. Plaintiff submits that it is simply not possible that on-duty Public Safety Officers and Command would have allowed Plaintiff to sit within 30-50 feet of President Barack Obama if Plaintiff was noticeably intoxicated. Plaintiff further submits that a Public Safety Officer would have arrested, detained, or investigated Plaintiff if they believed that they had observed Plaintiff committing a felony in their presence. Plaintiff was not investigated, detained, or arrested on June 7, 2010, and was indeed permitted entry into the building, where he sat near President Obama and took a photograph with him.

*Id.*

In contrast, Plaintiff does not provide any evidence that these were "sham" investigations that lacked a basis for consideration. (ECF No. 26, PageID.281.) Although he does not describe the basis of or present any evidence regarding the ethics investigation or the four hotline complaints, Defendants' motion for summary judgment attaches copies of three hotline complaints and the ethics investigation. (ECF Nos. 28-25, 28-26, 28-27.) In a July 23, 2023 hotline complaint, the complainant says Plaintiff "uses an FAA connection to run an ACE camp[11] in Detroit, where he abuses his non-profit board director seat to secure the only camp in the state for HIS non-profit. . . . He also recently attended events

---

[11] An "ACE camp" is a children's camp and one of the ways in which the FAA engages with young students. (ECF No. 28-10, PageID.430.)

in Michigan on duty time performing non-profit work." (ECF No. 28-25, PageID.557.) In the December 14, 2023 hotline complaint, the reporter complained that Plaintiff "presented himself as an FAA manager" at a private event when "[h]e was not authorized to speak at this event as an FAA official," which raises a "conflict of interest." (ECF No. 28-27, PageID.570.) In a June 6, 2024 hotline complaint, the anonymous complainant states that Plaintiff was a paid consultant for a university and the City of Detroit, which may violate "conflict of interest or conflict of commitment" policies. (*Id.* at PageID.571.) According to a March 14, 2024 report, the Acting Director, Operations Support Directorate requested the ethics investigation into Plaintiff based on two of the hotline complaints. (ECF No. 28-26, PageID.558.) The FAA investigated whether Plaintiff inappropriately posed as an FAA manager at events, committed time and attendance fraud, abused sick leave, or accepted gifts from outside sources in violation of FAA policy and the Code of Federal Regulations. (*Id.*)

These were not the first concerns over Plaintiff's actions outside of the FAA. For example, Plaintiff had given a presentation and operated a website that "appeared as though his company would provide . . . current

FAA employee expertise in providing mediation services, providing management training, and developing strategy" and was improperly identified as an FAA director on a non-profit website. (ECF No. 28-4, PageID.398.) On January 25, 2022, the FAA's Internal Investigations Branch concluded in a report that Plaintiff had "violated ethical standards by using his position with the FAA for private gain." (ECF No. 28-9, PageID.414.) Plaintiff ultimately ceased operating his consulting business "[i]n an effort to ensure there is not any perception of a violation of ethics and/or conflict of interest" (ECF No. 28-8, PageID.413). Moreover, in the 2024 ethics report, the FAA analyzed evidence for each allegation and provided evidence that the complaint was not frivolous on its face. For example, under the allegation of time and attendance fraud, the FAA reported that Plaintiff indicated he teleworked on a day that his Facebook profile showed him at his son's golf camp, and his Virtual Private Network ("VPN") records indicated he had only connected to the VPN for five minutes and otherwise had minimal website activity.[12] (*Id.*

---

[12] The report notes that Plaintiff "stated VPN was not a good method for tracking employees because an employee did not need to be connected to the VPN" to use Microsoft products. (*Id.* at PageID.560.)

at PageID.560.) And when investigating whether Plaintiff had abused sick leave, the FAA report found Plaintiff took sick leave on days he may have attended a conference or spent time with his son in Florida.[13] Viewing the evidence in the light most favorable to Plaintiff, and making no credibility determinations, these complaints were neither frivolous nor malicious and were nothing like the complaints in *Laster.*[14]

The Court finds that Plaintiff's case is like cases where investigations, along with other incidents, did not constitute adverse actions. In *Sutton,* another case alleging that investigations amounted to

---

[13] Plaintiff indicated that "spending time with his son helps him cope with the effects of the FAA's toxic work environment," which is consistent with his providers' recommendations to restore his mental health. (*Id.* at PageID.561.)

[14] Assuming for summary judgment purposes that Plaintiff had produced sufficient evidence to establish a *prima facie* case of retaliation based upon these complaints, Defendants have articulated an honest belief in the nondiscriminatory reason for the investigations, such as evidence-based concerns about recording time. *See Zandvakili*, No. 23-3396, 2024 U.S. App. LEXIS 1832, at *12. And "so long as the employer honestly believed in the proffered reason given for its employment action, the employee cannot establish pretext even if the employer's reason is ultimately found to be mistaken, foolish, trivial, or baseless." *Smith v. Chrysler Corp.*, 155 F.3d 799, 806 (6th Cir. 1998). When the "honest belief" rule is invoked, "the plaintiff must allege more than a dispute over the facts upon which [the adverse action] was based. He must put forth evidence which demonstrates that the employer did not 'honestly believe' in the proffered nondiscriminatory reason for its adverse employment action." *Tillman v. Ohio Bell Tel. Co.*, 545 F. App'x 340, 349 (6th Cir. 2013). Plaintiff does not put forth such evidence here.

Title VII retaliation, "routine" incident reports that did not result in any specific disciplinary action—even if they resulted in a reprimand—did not constitute materially adverse action. *Sutton*, 2024 U.S. App. LEXIS 7871, at *3 (distinguishing its facts from a case where the writeups resulted in discipline).

In conclusion, Plaintiff has failed to prove that in retaliation for his complaints about the 2022 termination of his position and ethics complaint, he experienced incidents that amount to a materially adverse action. No reasonable employee would be dissuaded from making or supporting a charge of discrimination because of two comments from a supervisor asking him to wait until he knows the facts before complaining to management, negative performance comments in e-mails and a midterm evaluation, or routine investigations that were not frivolous. On this basis alone, Plaintiff cannot satisfy the third prong of the *McDonnell Douglas* test, and Defendants are entitled to summary judgment.

## IV.   Conclusion

For the reasons set forth above, the Court GRANTS the motion for summary judgment. The case is DISMISSED with prejudice.

IT IS SO ORDERED.

Dated: August 11, 2025                    s/Judith E. Levy
      Ann Arbor, Michigan          JUDITH E. LEVY
                                United States District Judge

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or first-class U.S. mail addresses disclosed on the Notice of Electronic Filing on August 11, 2025.

                         s/William Barkholz
                         WILLIAM BARKHOLZ
                         Case Manager